Order, Supreme Court, Bronx County (Alison Y. Tuitt, J.), entered April 9, 2012, which denied defendants Thomas D. Steiner and Maureen Ferguson’s motion for summary judgment dismissing the complaint and all cross claims as against them, affirmed, without costs.
Defendant property owners failed to establish, as a matter of law, that they had no duty to maintain the electrical shunts that defendant Con Edison placed across the sidewalk in front of their property to provide emergency power for the tenants residing there. We have generally held that an issue of fact exists whether such equipment constitutes a special use of the sidewalk that creates a duty of care on the part of the property owner (see e.g. Cook v Consolidated Edison Co. of NY, Inc., 51 AD3d 447 [1st Dept 2008]; Eliassian v Consolidated Edison Co. of N.Y., 300 AD2d 51 [1st Dept 2002]).
Lewis v City of New York (89 AD3d 410 [1st Dept 2011]) has *518 no bearing on this matter. There, this Court awarded summary-judgment to the property owner, finding that it was prohibited from exercising control over a street grating and therefore bore no liability for the plaintiffs accident. The rule at issue there, 34 RCNY 2-07 (b), squarely places responsibility for gratings and the area extending 12 inches from their perimeter on their owners.
In this case, it is far less certain whether the rules on which the property owners rely apply and would relieve them of liability. Those rules prohibit private citizens from “installing], repair [ing], us [ing] or working] within three (3) feet of any type of City electrical equipment or non-City electrical equipment attached to City Property” (34 RCNY 2-20 [a] [2]). They further direct that “[n]o person shall break, deface, remove, or interfere with any lamp, gas, communication or electrical apparatus, or any part thereof, which shall be hung or fixed in any street or public place . . . except as authorized by the Department [of Transportation]” (34 RCNY 2-20 [a] [7]). The critical question here is whether a shunt is “electrical equipment” or an “electrical apparatus.” The rules define “electrical equipment,” when not owned by the City, as “property . . . which is attached to City Property and to which electrical connections can be made, including but not limited to, electrical devices and wood poles” (34 RCNY 2-01). The rules do not provide a definition for “electrical apparatus,” but that term and the term “electrical equipment” appear to be used interchangeably, since 34 RCNY 2-20 (a) (7), while prohibiting the destruction of “any lamp, gas, communication or electrical apparatus,” also directs that “[a]ll instances of damaged gas, communication or electrical equipment shall be reported to . . . 311.”
The property owners offer no support for their theory that the shunts on which plaintiff allegedly tripped constituted “electrical equipment,” and so have failed to carry their burden of establishing, as a matter of law, that they were prohibited from working within three feet of them, or otherwise “interfering” with them. Indeed, 34 RCNY 2-20 (b), which addresses the placement of shunts, suggests that a shunt is not “electrical equipment.” That rule specifically applies “to overhead, street and wrap-around shunts attached to City electrical equipment or running over/along a roadway or sidewalk” (34 RCNY 2-20 [b] [1] [emphasis added]).
The italicized words strongly suggest that a shunt itself does not qualify as “electrical equipment,” whether of the City or non-City variety. To the contrary, the term “electrical equipment” seems to connote permanent infrastructure. For example, *519 34 RCNY 2-20 (c) (3) addresses “the event that the Department installs an overhead shunt to restore power to City electrical equipment containing an electrical traffic control device.” Further evidence that the term “electrical equipment” refers to fixtures is that “street shunt” is defined as “a shunt that runs from a street light/lamppost or utility access cover along a roadway and/or sidewalk to a property or other street light/ lamppost” (34 RCNY 2-01). Significantly, the definition of “City Electrical Equipment” explicitly encompasses “wood poles and metal street light/lampposts” (34 RCNY 2-01). It is important to note that there is little concrete evidence in the record regarding what the shunt plaintiff tripped over was attached to. The witness produced by Con Edison read from records that he interpreted as possibly reflecting that the shunts were connected to a “service box” in the street, but he was unable to discuss in technical terms how power was restored to the house.
Accordingly, the record is devoid of any evidence that the property owners would have had to access “electrical equipment” to make safe the tripping hazard posed by the shunts. And while we are certainly not suggesting that ordinary homeowners should ever be required to tamper with shunts or move them, that was not required here, where plaintiff is only alleging that a protective board or other device covering up the shunts was required, which device defendants could, at the very least, have easily requested Con Edison to provide. In any event, even if a shunt is “electrical equipment,” nothing in the rules appears to have prohibited the property owners from taking steps to warn pedestrians about the hazard posed by the shunts in a manner that did not involve working within three feet of them or “interfering” with them in any respect.
Like the property owners, the dissent declares that the shunts over which plaintiff tripped were “electrical equipment” for purposes of 34 RCNY 2-20, without offering any support for that conclusion that can be found in the record or elsewhere. Again, the Con Edison witness on whose deposition testimony the dissent relies was a record searcher who readily admitted that he was unfamiliar with the technical jargon related to the manner in which power was restored to the property in question. Further, we disagree with the dissent’s statement that the utility that places shunts on a sidewalk has the sole responsibility to protect pedestrians from tripping over them. The rules that the dissent cites in support of that proposition do not say that. 34 RCNY 2-20 (b) (7) merely provides that “[t]he sidewalk areas over which the shunt runs and all wires shall be protected and ramped with a reflective covering.” 34 RCNY 2-05 (d) (17) *520 only says that “[a]ll equipment hoses, cables, or wires placed on the sidewalk while in use shall be bridged and protected by warning signs and/or lights.” Nothing in those rules even implies that utilities have exclusive control over sidewalk shunts so that homeowners deriving a special use from them have no obligation to protect pedestrians from harm posed by the shunts. Thus, because there is a question regarding the extent to which the property owners had control over the shunts, which the property owners acknowledge were for their benefit, an issue of fact exists whether they made special use of them and thus created an obligation to prevent harm arising from the hazard (see Cook, 51 AD3d at 448; Eliassian, 300 AD2d at 51).
Finally, we reject the property owners’ argument that, even if they had control over the shunts, they had no duty to maintain the condition, pursuant to section 7-210 of the Administrative Code of the City of New York. That section states that “[f]ailure to maintain [a] sidewalk in a reasonably safe condition shall include, but not be limited to, the negligent failure to install, construct, reconstruct, repave, repair or replace defective sidewalk flags and the negligent failure to remove snow, ice, dirt or other material from the sidewalk.” (Administrative Code § 7-210 [a].) We have previously stated that the tripping hazard posed by electrical shunts traversing a sidewalk implicates the Administrative Code (see Cook, 51 AD3d at 448). Accordingly, the property owners had a nondelegable duty to keep the sidewalk safe (see id.; Collado v Cruz, 81 AD3d 542 [1st Dept 2011]). Concur — Mazzárelli, J.P., DeGrasse, Richter and Clark, JJ.